## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| HEATHER M. WILSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:04-CV-510-PRC |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| Defendant. | ) | |

### ORDER

This matter is before the Court on Plaintiff's Memorandum In Support of Summary Judgment Or Remand [DE 18], filed by Plaintiff Heather M. Wilson on June 19, 2006.  The Plaintiff seeks reversal and remand of the Administrative Law Judge's ("ALJ") decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  For the following reasons, the Court grants the Plaintiff's Memorandum and remands this matter for further proceedings consistent with this Opinion.

### PROCEDURAL BACKGROUND

On December 26, 2001, Plaintiff filed an application for DIB and SSI, alleging disability since August 30, 2001 due to depression, post-traumatic stress disorder ("PTSD"), anxiety, and insomnia.  Plaintiff's application was denied initially on May 21, 2002, and again upon reconsideration on October 8, 2004.[1]  On January 24, 2003, Plaintiff filed a timely request for a hearing, which was held on January 8, 2004 before Administrative Law Judge ("ALJ") Steven J. Neary in Fort Wayne, Indiana.  Plaintiff appeared at the hearing as well as by and through his

---

[1]On March 22, 2000, Plaintiff filed a previous application for DIB, which was denied initially and again upon consideration.

counsel at that time, James Balanoff.  Plaintiff and a vocational expert ("VE") Leonard Fisher

testified.  In a decision dated May 27, 2004, the ALJ denied Plaintiff's application for DIB and SSI,

finding that, despite the limitations caused by her impairments, Plaintiff retained the residual

functional capacity ("RFC") to perform a significant number of jobs.  In the decision, the ALJ made

the following findings:

(1)     The claimant meets the nondisability requirements for a period of disability and [DIB] set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

(2)     There is insufficient information in the record to determine if the claimant has engaged in substantial gainful activity since the alleged onset of disability.

(3)     The claimant's depression, [PSTD], and anxiety are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

(4)     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

(6)     The claimant has the residual functioning capacity to perform simple, repetitive tasks.

(7)     The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(8)     The claimant is a "younger individual" (20 C.F.R. §§ 404.1563 and 416.963).

(9)     The claimant has at least a high school (or high school equivalent) education (20 C.F.R. §§ 404.1564 and 416.964).

2

(10)    The claimant has no transferrable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968).

(11)    Considering the types of work that the claimant is still functionally capable of performing in combination with the claimant's age, education, and work experience, she could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. Examples of such jobs include work as a dining room attendant (25,000 jobs exist in the region), dishwasher (16,000 jobs exist in the region), packer (9,000 jobs exist in the region), and assembler (15,000 jobs exist in the region).

(12)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(13)    The claimant has no exertional limitations (20 C.F.R. §§ 404.1545 and 416.945).

R. at 29-30.  On October 8, 2004, the Appeals Council denied the Plaintiff's request for review, making the ALJ's May 27, 2004 decision the final decision of the Commissioner.

## FACTS

A.    **Background**

Plaintiff was 29 years of age at the time of the ALJ's decision.  She has a high school education (GED), has some college experience, and completed emergency medical technician ("EMT") training in June 2001.[2]  Plaintiff's work experience includes jobs as a security officer; a

---

[2] The Court notes that a discrepancy exists as to how many years of college the Plaintiff completed.  The Commissioner asserts that, according to a "Disability Report Adult" dated December 23, 2001, the Plaintiff completed three years of college.  *See* R. at 123.  On the contrary, the Plaintiff asserts that, according to another "Disability Report Adult" dated February 29, 2000, that she only completed one year of college.  *See* R. at 91.  Both forms were completed and signed by the Plaintiff.

3

groundskeeper, a secretary, and a cashier at a resort; a Certified Nursing Assistant at a nursing home;

a bank teller; a janitor; a secretary; a shift manager, a cashier, a cook, and a waitress at a restaurant;

a babysitter; a cashier at a drive-in movie theater; and a dietary aide.

## B.   Medical Evidence

On January 11, 1991, Charter Hospital of Northwest Indiana admitted the Plaintiff at the age

of 15.  Under the heading "Reason for Hospitalization", the admitting physician listed, among other

things, that Plaintiff had (1)  "plans to kill herself, her father, as well as her mother while they slept

by putting the house on fire"; (2) a history of suicide attempts and self-mutilating behavior; and (3)

a history of alcohol and drug abuse.  R. at 157, 160.  The Plaintiff was diagnosed with major

depression with homicidal and suicidal ideation, bipolar disorder of adolescence, mixed substance

abuse, asthma, family dysfunction, and passive aggressive personality features.  On February 8,

1991, Charter Hospital discharged the Plaintiff.

From November 1997 through September 2000, Plaintiff received treatment at the Family

Care Center of Indiana ("FCCI") for a wide variety of physical conditions as well as anxiety,

depression, and insomnia.  The record contains progress notes tracking the Plaintiff's physical and

mental problems.  Plaintiff's physical impairments included predominantly minor problems such

as rashes, skin infections, nausea, diarrhea, stomach cramping, sleep problems, high cholesterol,

pelvic pain, salpingitis[3], excessive hair growth, bacterial vaginosis, gastritis[4], lumbar myositis[5],

bronchitis, tonsillitis, yeast infections, iron deficiency, recurring urinary tract infections, acne, and

---

[3]Salpingitis refers to "[i]nflammation of the uterine tube."  Stedman's Medical Dictionary 1715 (28th ed.).

[4]Gastritis refers to "[i]nflammation, especially mucosal, of the stomach."  Stedman's Medical Dictionary 790 (28th ed.).

[5]Myositis refers to "[i]nflammation of the muscle."  Stedman's Medical Dictionary 1275 (28th ed.).

chest pains.  Plaintiff's mental impairments included major depression, acute anxiety, forgetfulness, increased stress and anxiety, insomnia, chronic fatigue, and neurodermatitis.[6]

On December 23, 1999, Brooke A. Jackson, M.D., examined the Plaintiff at the FCCI.  Dr. Jackson's impression and plan revealed "neurodermatitis, most likely related to anxiety", and the possibility of a "perioral [Herpes Simplex Virus] infection."   R. at 228-29.

From January 28, 1999 through November 2002,[7] the FCCI records contain treatment notes from Dr. Manuel Ozoa, a psychiatrist at Lakeview Clinic of Psychiatry and Behavioral Medicine. Dr. Ozoa saw the Plaintiff approximately seventeen times in that time period.  *See* R. at 327, 480. Dr. Ozoa prescribed the following medications: Effexor, Xanax,[8] and Trazodone.[9]  While Dr. Ozoa's notes are only marginally legible, the Plaintiff complained of mood irritability, agitation, and depression.  On the Plaintiff's initial visit on January 28, 1999, Dr. Ozoa's diagnosis was major depression with anxiety attacks and PTSD.  On August 31, 2001, Dr. Ozoa saw the Plaintiff on an emergency basis because she felt she could not continue the pregnancy without Effexor because of anxiety/panic attacks and mood swings.  On September 14, 2001, Plaintiff complained of stress related to her sons being in foster care. On March 10, 2002, Plaintiff complained of difficulty sleeping and Xanax was prescribed.

---

[6]Neurodermatitis refers to "[a] chronic lichenified skin lesion, localized or disseminated."  Stedman's Medical Dictionary 1309 (28th ed.).

[7]The record indicates that the Plaintiff saw Dr. Ozoa through at least November 11, 2002, despite the dates provided by the Plaintiff and the Commissioner, which indicate that Plaintiff's last visit with Dr. Ozoa was in July 2002.

[8]Xanax is used to treat anxiety and panic disorders.

[9]Effexor and Trazodone are anti-depressant medications used to treat a variety of conditions, including depression and other mental/mood disorders.  *See generally*, http://www.webmd.com.

On July 24, 2000 and August 20, 2001, Plaintiff underwent psychological examinations at Mid-America Psychological & Counseling Services, P.C. ("MAPCS"), "in order to access [sic] her current levels of cognitive and emotional functioning." R. at 350. Drs. Kalyani Gopal, Ph.D., HSPP, and Harry E. Gunn, Ph.D., HSPP, both clinical psychologists, performed both examinations. They gathered information on Plaintiff's history and background, including her significant depression. At the July 24, 2000 examination, Drs. Gopal and Gunn summarized that Plaintiff was "functioning at the near Superior Range of cognitive abilities" and that she reported that she was "doing well in her job and that it has given her a comfortable stability that she otherwise has not had. R. at 347-48. At the August 20, 2001 examination, Drs. Gopal and Gunn observed that, as to her physical and behavioral description, "her test productivity was average and she did enjoy her successes on those few occasions when she recognized that she had done well." They summarized that Plaintiff showed "Average to High Average Intellectual abilities" who "appears to be a very striding person and had made some significant gains in her life, but the abuse of her son was an absolute crushing blow to her." R. at 353. At both examinations, Drs. Gopal and Gunn concluded that Plaintiff had major depressive disorder (in partial remission), PTSD, and dependent personality, with a Global Assessment Functioning ("GAF") score of 55.[10]

From August 31, 2000 through October 17, 2002, Plaintiff regularly attended individual and family therapy sessions at MAPCS. During this period of time, Plaintiff attended approximately fifty-five scheduled appointments. *See* R. at 355-411. Treatment notes from these sessions track the Plaintiff's psychological symptoms including evidence of Plaintiff's anxiousness and stress.

---

[10]A GAF of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

From August 19, 2002 through about December 22, 2003, Robert Buynak, M.D., from Porter Health Services examined the Plaintiff on approximately fourteen occasions.  Dr. Buynak treated the Plaintiff for relatively minor physical impairments, including but not limited to, high cholesterol, acne, back pain, benign skin lesions, and dermatitis.  Dr. Buynak prescribed Effexor for Plaintiff's anxiety.

From December 2002 through February 2004, Plaintiff received outpatient services assessment through individual and group therapy sessions at the Porter-Starke Counseling Centers.  Counselor Gary Secrest, MA, LMHC, examined the Plaintiff on several occasions.  At her initial December 18, 2002 appointment, the Plaintiff reported that while she was unemployed (at that time), she volunteered approximately thirty (30) hours per week at the fire department.  Mr. Secrest's mental status examination of the Plaintiff revealed the following: "She presented with no paranoid ideation or delusional thinking.  Her thought processes were logical with a goal-directed stream of thought, and she was able to concentrate.  She denied any perceptual hallucinations.  Her intellect appeared to be average, and her awareness of her illness was preserved."  R. at 469.  Further, his assessment summary demonstrated that "[h]er thought content did not indicate suicidal or homicidal ideations or psychotic features."  R. at 470.  Mr. Secrest offered a diagnosis of major depression, recurrent, with a GAF of 58.  Mr. Secrest noted that her "[p]rognosis is good" but "dependent on follow through with treatment recommendations and treatment interventions."  R. at 471.

At the vast majority of sessions after the initial session on December 18, 2002 through her last session on February 18, 2004, Mr. Secrest reported no significant changes in Plaintiff's

treatment plan.[11]  The focus of all of these sessions was depression.  On numerous other scheduled appointments, the Plaintiff either failed to attend her scheduled appointment or called and cancelled with various excuses.[12]  At her last scheduled appointment with Mr. Secrest on February 18, 2004, Plaintiff reported that she was taking Lexapro[13], which had a "positive effect on her symptoms," however she felt the reduction in her symptoms resulted from her "awareness and not necessarily the medication."  R. at 504.  She further reported that she was "experiencing an increase in symptoms, most prominently difficulty sleeping and poor concentration."  R. at 504.

**C.      Plaintiff's testimony**

Plaintiff testified that she has not worked since August 31, 2001 when she worked as an EMT for Superior Ambulance Company.  Plaintiff testified that her depression greatly limits her ability to work.  Plaintiff further testified that while was "physically" healthy enough to work, she felt that she was not "emotionally" healthy enough to work.  She testified that her treatment as of the date of the May 24, 2004 hearing included individual and group therapy, prescription medication of Effexor and Xanax, which reduced libido, affected weight, and caused restlessness.

She testified that she continued to deal with issues relating to physical, sexual, and emotional abuse stemming from her childhood, and that she cries "almost on a daily basis."  R. at 47.  She further testified that when she was younger, she attempted suicide twice.  She stated that she continued to have suicidal thoughts but declined to verbalize them out of fear that her therapists may

---

[11]These dates include:  January 29, February 7, March 5, March 19, April 18, May 13, May 27, July 1, July 30, August 14, September 8, September 22, October 15, November 3, November 17, and December 12, 2003 as well as February 18, 2004.

[12]These dates include:  April 3, April 24, July 10, July 15, and September 4, 2003 as well as January 15, January 20, February 2, and February 10, 2004.

[13]Lexapro is an antidepressant medication used to treat a variety of conditions, including depression and other mental/mood disorders.  *See generally*, http://www.webmd.com.

"take my children and put me in a hospital."  She also testified that she was attempting to regain custody of two of her younger children.

Plaintiff testified that she spent most days in bed.  She testified that her boyfriend cared for their twenty-one month old child.  She testified that she began housework but rarely finished it.  She testified that she rarely prepared meals but did the budgeting and helped her boyfriend complete his application for disability. Plaintiff testified that she sometimes dressed and bathed herself.  She testified that did not like to go out because she felt people were staring at her and that she no longer grocery shopped alone because she was too indecisive.  She testified that she experienced difficulty sleeping and must take large doses of Trazodone in order to sleep.

## D.     VE's testimony

In his first hypothetical question, the ALJ asked the VE to assume an individual with the same age, educational background, and past work experience of the Plaintiff, and who was limited to simple, repetitive tasks.  The VE responded that while Plaintiff's past work required functioning "above" simple, repetitive tasks, other jobs existed that the individual could perform, including work as a dining room attendant (25,000 jobs exist  in the region), dish washer (16,000 jobs exist in the region), packer (9,000 jobs exist  in the region), and assembler (15,000 jobs exist  in the region).

In his second hypothetical question, the ALJ asked the VE to assume an individual with the same age, educational background, and past work experience of the Plaintiff, and who had limitations consistent with the Plaintiff's testimony.  The VE responded that there would be no jobs existing in significant numbers in the national economy that the individual could perform.

## E.     ALJ's Decision

Applying the five step sequential evaluation, the ALJ concluded that the Plaintiff was not disabled within the meaning of the SSA. At step one, the ALJ determined that insufficient information existed in the record in order to determine if the Plaintiff performed any disqualifying work since the alleged onset date. At steps two and three, the ALJ determined that the Plaintiff's depression, PSTD, and anxiety constituted "severe" impairments within the meaning of the SSA but not "severe" enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. At step four, the ALJ undertook the task to determine whether the Plaintiff retained the RFC to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. The ALJ found Plaintiff's testimony and subjective allegations were "not generally credible because they are not consistent with the objective medical evidence nor are they corroborated by any medical opinion of record." R. at 25. The ALJ found that the Plaintiff retained the RFC to perform simple, repetitive tasks. Relying on the testimony of the VE, the ALJ determined that the Plaintiff was unable to perform any of her past relevant work. Finally, at step five, again based on the testimony of the VE, the ALJ determined that, considering the Plaintiff's age, educational background, work experience, and RFC, the Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy, such as work as a dining room attendant (25,000 jobs exist in the region), dish washer (16,000 jobs exist in the region), packer (9,000 jobs exist in the region), and assembler (15,000 jobs exist in the region). Accordingly, the ALJ concluded that the Plaintiff was not "disabled" as defined in the SSA at any time through the date of the ALJ's Decision.

## STANDARD OF REVIEW

10

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not

required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) .  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. § 404.1520(a)(4).  The steps are:

(1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2.

(2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3.

(3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4.

(4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5.

(5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(I)-(iv); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).   At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC.  "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations."  *Young*, 362 F.3d at 1000.  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ.  *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

In her opening brief, the Plaintiff proffers the following arguments: (1) the ALJ made an erroneous finding at step three because the Plaintiff's impairments meet, or in combination equal, Listing 12.04 and/or 12.06; (2)  the ALJ made an erroneous RFC finding because he failed to offer

any reasoning for his finding that the Plaintiff is able to perform "simple, repetitive tasks"; (3) the

ALJ's credibility finding is erroneous because he failed to follow the requirements of SSR 96-7p;

and (4) the ALJ's step five determination is not based upon substantial evidence.

The Court will address each of the Plaintiff's arguments in turn.

## A.    Step three and Listing

The Plaintiff argues that the ALJ committed error at step three because Plaintiff's depression

meets Listing 12.04[14] and the ALJ failed to perform the proper analysis in determining whether the

---

[14]Listing 12.04 ("Affective Disorders") provides:

> Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or b. Appetite disturbance with change in weight; or c. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide; or I. Hallucinations, delusions or paranoid thinking; or
> 2. Manic syndrome characterized by at least three of the following:
> a. Hyperactivity; or b. Pressure of speech; or c. Flight of ideas; or d. Inflated self-esteem; or e. Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking; or
> 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
> *And*
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration;
> *Or*
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a

Plaintiff's severe impairments met or equaled a Listing.  Pl.'s Mem. In Supp. of Summ. J. or

Remand at 11 (hereinafter, "Pl.'s Mem.").  Plaintiff further argues that the ALJ also erred in that

Plaintiff's anxiety meets Listing 12.06.[15]

---

minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04 (first and second emphases added).

   [15]Listing 12.06 provides:

Anxiety Related Disorders:  In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documents findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a. Motor tension; or b. Autonomic hyperactivity; or c. Apprehensive expectation; or d. Vigilance and scanning; or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress:  *AND*

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompression each of extended duration.  *OR*

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.06 (first and second emphases added).

The Introduction to Listing 12.00 explains that an individual may be found to have a listed impairment "if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."  20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4, Listing 12.00.  The Seventh Circuit requires only that an ALJ "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability."  *Pope v. Shalala*, 998 F.2d 473, 481 (7th Cir. 1993) (citation omitted), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 2003).  At step three, the Plaintiff bears the burden to prove that his impairments meet the requirements of a listing.  *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).  An applicant must satisfy all of the criteria in a listing in order to receive an award of DIB at step three.  *Id.* (citing *Pope v. Shalala*, 998 F.2d at 480; *Anderson v. Sullivan*, 925 F.2d 220, 223 (7th Cir. 1991)).  An ALJ's failure to explicitly refer to a relevant listing alone does not necessitate remand.  *Rice v. Barnhart,* 384 F.3d 363, 369-70 (7th Cir. 2004) (citation omitted).  However, remand may be necessary where failure to explicitly refer to a relevant listing is combined with a perfunctory analysis.  *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786-87 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) ("In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name *and* offer more than a perfunctory analysis of the listing") (emphasis added) (citations omitted).

As a threshold matter, the Court notes that the ALJ failed to specifically refer to Listing 12.04 or 12.06.  *See* R. at 24 ("The medical evidence indicates that the claimant has depression, [PSTD], and anxiety, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet of medically equal, either singly or in combination, one of the impairments

listed in Appendix 1, Subpart P, Regulations No. 4."). Next, the Court must review the ALJ's analysis and determine whether he completed a sufficient analysis at step three by articulating his findings.

However, the Court notes that, in support of her argument that she meets Listings 12.04 and/or 12.06, Plaintiff relies on medical evidence of record as well as the Plaintiff's testimony and subjective allegations. For the reasons cited below as to the ALJ's credibility finding, *see infra* at part C, the Court is unable to conclude from the ALJ's decision what portions of Plaintiff's testimony he found credible and what portions of Plaintiff's testimony he found not credible. Accordingly, the Court finds that it cannot adequately review and determine whether the Plaintiff's "severe" impairments meet or medically equal Listing 12.04 and/or 12.06 at step three without further direction and clarification as to the ALJ's credibility finding.

**B.    RFC**

The Plaintiff argues that the ALJ made an erroneous mental RFC finding by failing to offer any reasoning in support of his determination that the Plaintiff was able to perform "simple, repetitive tasks." More specifically, the Plaintiff asserts that the ALJ failed to engage in a detailed assessment of Plaintiff's capacity to perform and sustain mental activities critical to work, as required under SSR 85-16, and the ALJ failed to explain what evidence he relies on in making his RFC finding. The Court will address these two arguments in turn.

RFC refers to what an individual can do despite the limitations imposed by his or her impairments. 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The RFC is an issue at steps 4 and 5 of the sequential evaluation process. "The RFC

assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8P, 1996 WL 374184, at *3. To ensure a valid RFC determination, the ALJ must follow SSR 96-8P, which provides that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work related abilities on a function-by-function basis." *Id.* at *1. This assessment should further "include[s] a narrative discussion describing how the evidence supports each conclusion ...." *Id.* at *7.

In formulating the RFC, while "an ALJ may not ignore an entire line of evidence that is contrary to [his] findings", *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999), it is sufficient for the ALJ to "articulate, at some minimum level, her analysis of the evidence", *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

In this case, the ALJ found that the Plaintiff retained the RFC "to perform simple, repetitive tasks." R. at 28.

*1.      SSR 85-16*

Plaintiff argues that the ALJ failed to engage in a detailed assessment of Plaintiff's capacity to perform and sustain mental activities critical to work, as required by SSR 85-16.

When assessing the claimant's mental abilities, the ALJ will "first assess the nature and extent of [her] mental limitations and restrictions and then determine [her] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(c); *Gardner v. Barnhart*, 2004 WL 1470244, *13 (N.D. Ill. June 29, 2004). The determination of mental RFC focuses on the claimant's work-related abilities. 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 ("RFC is a multidimensional description of the work-related abilities you retain in spite of your medical

18

impairments"). Under SSR 85-16, mental impairments must be considered in "a detailed assessment of the individual's capacity to perform and sustain mental activities which are critical to work performance." SSR 85-16, 1985 WL 56855, at *1. Relying on 20 C.F.R. §§ 404.1545(c) as well as 416.945(c), SSR 85-16 instructs that an evaluation of RFC in mental disorders includes "consideration of the ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting." *Id.* The determination of a mental RFC involves the consideration of evidence, such as: (1) history, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of numerous psychological symptoms; (2) reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior; and (3) reports from workshops, group homes, or similar assistive entities. SSR 85-16, 1985 WL 56855, at *2. Pursuant to SSR 85-16, consideration should be given to factors such as (1) the quality of daily activities, both in occupational and social spheres, as well as the individual's actions with respect to a medical examination; (2) the ability to sustain activities, interests, and relate to others over a period of time as well as the frequency, appropriateness, and independence of the activities; (3) the level of intellectual functioning; and (4) the ability to function in a work-like situation. *See Id.*

The Court finds that the ALJ relied upon and considered the factors specified in SSR 85-16. As to the Plaintiff's actions with respect to a medical examination, the ALJ discussed Mr. Secrest's descriptions of the Plaintiff's response as "responsive" or "cooperative in her initiative to begin session" for every scheduled appointment in which they met. *See* R. at 438-97. He further noted on numerous occasions that her "interactions were open" and that her "communication was actively

engaged." *Id.* As to the Plaintiff's ability to sustain activities, interests, and relate to other over a period of time and the ability to function in a work-like situation, the ALJ discussed Plaintiff's statements to Mr. Secrest on December 18, 2002 that although she was unemployed, "she spends a lot of time volunteering at the fire department", specifically about thirty (30) hours per week. R. at 470. As to the Plaintiff's level of intellectual functioning, the ALJ highlighted Plaintiff's two visits to MAPCS in July 2000 and August 2001. At the former psychological examination in July 2000, Drs. Gunn and Gopal's cognitive/neurological assessment of the Plaintiff, based on her scaled scores on the Weschler Adult Intelligence Scale-III ("WAIS-III"), revealed a "High Average ability" on verbal IQ and "Above Average Intelligence" on performance IQ and full-scale IQ. R. at 351-352. They summarized their findings describing the Plaintiff as a person who "shows Average to High Average Intellectual abilities." R. at 353. In the same manner, at the latter psychological examination in August 2001, Drs. Gunn and Gopal's cognitive/neurological assessment of the Plaintiff, again based on scaled scores on the WAIS-III, revealed "a slight increase from her prior testing" as well as indications that the Plaintiff has "near Superior cognitive abilities." R. at 345-46. Drs. Gunn and Gopal summarized their findings describing the Plaintiff as "currently functioning at the near Superior Range of cognitive abilities." R. at 347.

Furthermore, after the ALJ stated his conclusion as to Plaintiff's RFC to perform "simple, repetitive tasks", the ALJ specifically emphasized the fact that the "State Agency psychologists felt that the claimant did not have severe mental impairments." R. at 28 (citing R. at 328-41). In that State agency psychologist's psychiatric review, the reviewing physician made the following findings as to the Plaintiff's functional limitations: mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration,

persistence, and pace;[16] and no extended duration episodes of decompensation.[17]  *See* R. at 338.

These findings nearly mirror the SSR 85-16 factors.

Accordingly, the Court finds that the ALJ's RFC assessment that the Plaintiff can perform

"simple, repetitive tasks" satisfied the requirements of SSR 85-16.

2.     *Specific evidence supporting ALJ's RFC*

Plaintiff argues that the ALJ failed to explain what evidence he relied on in determining his

RFC finding and that the ALJ failed to consider other medical evidence of record regarding

Plaintiff's mental limitations which "shows that Plaintiff's mental impairments limit her from being

able to perform all work."  Pl. Mem. at 17.

The Court finds that the ALJ sufficiently explained his RFC finding and supported it with

medical evidence of record.  As noted above, the ALJ first provided a detailed analysis of the

medical evidence of record, which supports his mental RFC finding of "simple, repetitive tasks."

After the ALJ stated his RFC finding, the ALJ, *in the next sentence*, immediately proffers additional

support of his RFC finding by directing the reader to the "Psychiatric Review Technique" performed

by a State Agency psychologist and reviewed and affirmed as written by another State Agency

psychologist.  The ALJ then continues to clarify the basis for his RFC finding:

> While there is no basic disagreement that the claimant is not
> completely disabled by her mental impairments, the undersigned
> finds it reasonable to conclude that the claimant does have severe
> mental impairments and should be limited to simple, repetitive tasks
> *given her* remote history of psychiatric hospitalizations, her
> complaints of problems with her family and finances, and with the
> aforementioned occasional references to problems with her attention
> in her more recent therapy notes.

---

[16]The degree of limitation ranged from none to extreme.

[17]The degree of limitation ranged from none to four or more.

R. at 28 (emphasis added).  The ALJ next rules out a more restrictive mental RFC "given her lack of corroborating medical opinion of record to support the claimant's allegations." *Id.*  Accordingly, while at the very least the ALJ met the standard of minimally articulating his analysis of the evidence in support of the mental RFC, *see Dixon*, 270 F.3d at 1176, the Court finds that the ALJ optimally supported his mental RFC finding with substantial medical evidence in the record.

Next, the Plaintiff cites passages from Mr. Secrest's "narrative notes" as evidence which she contends supports a mental RFC that the Plaintiff's mental impairments limit her from being able to perform all work.  For example, the Plaintiff highlights Mr. Secrest's finding on September 2, 2003 that the Plaintiff was "stressed over the fact that the Division of Family and Children Services has told her that she has to put out 14 applications per week into the community to attempt to gain employment."  R. at 500.  Then, on September 8, 2003, once the Plaintiff made the decision to relinquish funding by not seeking employment, she reported to Mr. Secrest as "feeling better."  R. at 497.  Therefore, the Plaintiff argues, this demonstrates the Plaintiff's inability to cope with "customary work pressures."  *See* SSR 85-16, 1985 WL 56855, at *1.

As a threshold matter, the Court notes that the ALJ discussed Mr. Secrest's narrative notes of all his sessions with the Plaintiff, therefore the ALJ considered the two passages relied upon by the Plaintiff in determining his RFC.  Further, while the two passages cited by the Plaintiff may provide minimal evidence regarding the Plaintiff's inability to cope with "customary work pressures", the Court finds that the majority of the notes from Mr. Secrest's sessions provides evidence to the contrary, i.e., the Plaintiff's ability to cope with "customary work pressures."  For example, as the Court noted above, Mr. Secrest consistently described the Plaintiff's responses as "cooperative", her interactions as "open", and her communication as "actively engaged."  *See* R. at

438-97.  Plaintiff merely cherry-picks two sentences in favor of her position from over sixty pages of Mr. Secrest's narrative notes and findings while the vast majority of Mr. Secrest's findings provide evidence to the contrary.

Next, Plaintiff argues that the ALJ "understates" the significance of Plaintiff missing or cancelling numerous sessions with Mr. Secrest.  Once again, the Court notes that the ALJ specifically discussed the Plaintiff's failure to appear at a number of sessions, therefore the ALJ considered and relied upon that evidence in determining his RFC.  The Commissioner responds that the Plaintiff's failure to appear suggests that "her treatment was not a priority to her, which belies her claims of debilitating limitations."  Mem. Supp. Comm.'s Decision at 14 (hereinafter, "Comm.'s Mem.").  While both the Plaintiff's and the Commissioner's arguments are reasonable, the Court finds that the ALJ's specific discussion of the Plaintiff's absences sufficiently demonstrates that he considered and factored this evidence into his RFC finding.

Accordingly, the Court finds that the ALJ's RFC finding is supported by substantial medical evidence in the record.  However, because the Court is remanding this matter for further proceedings regarding the ALJ's credibility determination, *see infra* part C, it may be necessary for the ALJ to revisit his RFC finding.

**C.        Credibility and SSR 96-7p**

The Plaintiff argues that the ALJ made an erroneous credibility finding by failing to follow the requirements of SSR 96-7p.  More specifically, the Plaintiff asserts that the ALJ failed to include specific reasons and medical evidence in support of his credibility finding.

After discussing the Plaintiff's testimony and subjective allegations, the ALJ found "them not generally credible because they are not consistent with the objective medical evidence nor are

23

they corroborated by any medical opinion of record." R. at 25. Immediately following his credibility determination, the ALJ engages in a detail assessment of the medical evidence of record.

The Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statements about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. The Regulations establish a two-part test for determining whether subjective complaints of pain contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *See* 20 C.F.R. § 404.1529(a), (c); *see Pope v. Shalala*, 998 F.2d 473, 482 (7th Cir. 1993).

In applying this two-part test, an ALJ must weigh the claimant's subjective complaints and the relevant objective medical evidence as well as any other evidence. In addition, the ALJ may consider the following factors:

(1)   The individual's daily activities;
(2)   Location, duration, frequency, and intensity of pain or other symptoms;
(3)   Precipitating and aggravating factors;
(4)   Type, dosage, effectiveness, and side effects of any medication;
(5)   Treatment, other than medication, for relief of pain or other symptoms;
(6)   Other measures taken to relieve pain or other symptoms; and
(7)   Other factors concerning functional limitations due to pain or other symptoms.

24

20 C.F.R. § 404.1529(c)(3).  In making a credibility determination, SSR 96-7p provides that an ALJ

"must consider the entire case record, including the objective medical evidence, the individual's own

statements about symptoms, statements and other information provided by treating or examining

physicians or psychologists and other persons about the symptoms and how they affect the

individual, and any other relevant evidence in the case record."  SSR 96-7p, 1996 WL 374186, at

*1.  The Ruling further provides that the "determination or decision must contain specific reasons

for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator

gave to the individual's statements and the reasons for that weight."  *Id.*; *see Steele v. Barnhart*, 290

F.3d 936, 942 (7th Cir. 2002); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001), 245 F.3d at

887.  "Without an adequate explanation, neither the applicant nor subsequent reviewers will have

a fair sense of how the applicant's testimony is weighed."  *Steele*, 290 F.3d at 942 (citations

omitted).

Moreover, the Regulations provide that "the adjudicator may also consider his or her own

recorded observations of the individual as part of the overall evaluation of the credibility of the

individual's statements."  SSR 96-7P.  As the Seventh Circuit has stated, "because hearing officers

are in the best position to see and hear the witnesses and assess their forthrightness, we afford their

credibility determinations special deference."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)

(internal quotations and citations omitted).  Generally, an ALJ's credibility determination will not

be overturned unless it was "patently wrong."  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003);

*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (providing that "[s]ince the ALJ is in the best

position to observe witnesses, we usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong").

Here, the Plaintiff argues that the ALJ failed to support his credibility determination with specific reasons and medical evidence in violation of SSR 96-7p.  The Court agrees.

At the risk of repeatedly quoting passages from SSR 96-7p, the Court finds it necessary to quote once more.  SSR 96-7p provides, in pertinent part:

> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.
> ... The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  ...  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well- reasoned determination or decision.

SSR 96-7p, 1996 WL 374186, at *4.  The Court finds that the ALJ's credibility finding failed to cite any specific reasons for his finding rendering this Court unable to determine the "weight [he] gave to the individual's statements and the reasons for that weight."  *Id.*  For example, the ALJ found that the Plaintiff's testimony and subjective allegations were "not generally credible."  SSR 96-7p provides that an ALJ "may find all, only some, or none of an individual's allegations to be credible" or "may find an individual's statements, such as statements about the extent of functional limitations or restrictions due to pain or other symptoms to be credible to a certain degree."  *Id.* at * 4.  In other words, an ALJ "need not totally accept or reject the individual's statements."  *Id.*  Here, the ALJ's

26

determination that the Plaintiff's testimony and subjective allegations were "not generally credible" is so ambiguous that it fails to provide any guidance to this Court (and any other reviewer) as to what he found credible and what he found not credible.  Accordingly, the Court lacks "a fair sense of how the [Plaintiff's] testimony [wa]s weighed."  *Steele*, 290 F.3d at 942 (citations omitted).[18]

In *Zurawski*, the Seventh Circuit found that the ALJ's determination that the Plaintiff's complaints of disabling pain were "not entirely credible due to the inconsistencies with the objective medical evidence, and inconsistencies with daily activities" failed to provide sufficient explanation in line with SSR 96-7p and 20 C.F.R. § 404.1529.  245 F.3d at 887.  Based on the ALJ's finding, the Court stated that it is "left to ponder what exactly are these 'inconsistencies' because the ALJ provided no further explanation."  *Id.*  Likewise here, based on the face of the ALJ's decision, this Court may ponder what the ALJ considered credible and what he considered not credible.  For example, because the ALJ failed to specify, this Court may opine that he considered the Plaintiff's statement that she only showers once or twice a month not credible but considered her statements that she feels confused, anxious, and hysterical and that she has lost her physical energy credible.  Accordingly, the Court finds that it lacks a "sufficient basis to sustain the ALJ's credibility determination."  *Id.* at 888; *see also Kornfeld v. Apfel*, No. 00-C-5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003) (interpreting *Zurawski* as "recit[ing] the general proposition that the ALJ should provide specific explanation in her credibility determination ...").

---

[18]As additional support for her argument, the Plaintiff cites *Jones v. Heckler*, 583 F.Supp. 1250 (D.C. Ill. 1984), for the proposition that the ALJ's credibility finding reflects a "result-oriented rather than justice-oriented" determination.  *Id.* at 1253.  The Court finds the *Jones* case to be not on point here because (1) credibility was not at issue in that case and (2) the *Jones* case was decided twelve years prior to the publication of SSR 96-7p, which is the central focus of this Court's inquiry.  *See* SSR 96-7p, 1996 WL 374186, at *1 ("July 2, 1996").  Thus, the language in *Jones* is not persuasive here.

As evidence that the ALJ supported his credibility determination with medical evidence, the Commissioner argues that "the ALJ's credibility finding is found proximate in his decision to his thorough discussion of the medical evidence, which is followed by his conclusion that the medical evidence could not support the presence of limitations of more than moderate severity."  Comm.'s Mem. at 14.  In other words, the Commissioner argues that the ALJ need only strategically position his credibility finding within a proximate location (within his decision) to the supporting medical evidence.  While a quick glance at the ALJ's decision reveals that his credibility finding is proximately located to the medical evidence, as the Commissioner argues, the Court finds that this is irrelevant because it is not the standard.  Further, the Commissioner cites no case law or regulation supporting his contention that "proximate" location of medical evidence to an ALJ's credibility finding satisfies the requirements of SSR 96-7p.

In further support of the ALJ's credibility finding, the Commissioner relies on *Sienkiewicz v. Barnhart*, 409 F.3d 798 (7th Cir. 2005), specifically highlighting the Court's emphasis that the plaintiff's complaints of extreme pain were inconsistent with findings of all doctors who examined her and opined that she had only minimal or moderate limitations, and discrepancies between symptoms and medical evidence is probative of exaggeration.  *Id.* at 803.  The Commissioner's citation to this case misses the point of the Plaintiff's argument.  This Court takes no position on whether the Plaintiff's medical evidence disputes or corroborates her testimony.  While the passage in *Sienkiewicz* may or may not be applicable to the instant case, the Court cannot say one way or the other because the ALJ failed to specify in any meaningful way the reasons for his credibility finding and the medical evidence that he believes disputes her testimony and subjective allegations.  What's more, immediately before the passage relied upon by the Commissioner, the *Sienkiewicz* Court

28

stated that "[t]he ALJ here adequately explained his credibility finding." *Id.*  This is the issue here, but, contrary to *Sienkiewicz*, the Court finds that the ALJ failed to adequately explain his credibility finding in this case.

Finally, the Court advises the parties that the above analysis in no way suggests that the ALJ's credibility determination was incorrect, but "only that a greater evaluation is necessary" as to (1) what parts of the Plaintiff's testimony and subjective allegations the ALJ deemed credible and not credible and (2) the ALJ's specific reasons therefor.  *See Zurawski*, 245 F.3d at 888.

**D.      Step five**

Plaintiff argues that the ALJ committed error at step five because (1) he posed an incomplete hypothetical question to the VE and (2) the jobs cited by the VE lack specificity in order to eliminate a conflict with the Dictionary of Occupational Titles ("DOT").[19]

*1.      Incomplete hypothetical question*

Plaintiff argues that the ALJ's hypothetical to the VE was incomplete because it failed to include all limitations supported by the medical evidence, specifically the limiting effects of Plaintiff's anxiety or PTSD.

On the contrary, the ALJ discussed Plaintiff's anxiety and PTSD in detail.  At step two, the ALJ determined that the medical evidence indicates that the Plaintiff has depression, [PTSD], and anxiety", which qualify as "severe" impairments within the SSA.  R. at 24.  Further, at step four, the ALJ specifically discussed Plaintiff's sessions with Dr. Ozoa, noting that the Plaintiff "was seen for depression and [PTSD]."  R. at 26.  In addition, the ALJ's decision contains other references to Plaintiff's anxiety and PTSD, such as Plaintiff's psychiatric review by Drs. Gopal and Gunn in July

---

[19]The DOT, published by the Department of Labor, gives detailed physical requirements for a variety of jobs.

2000 and August 2001.  *See* R. at 27.  Accordingly, the Court finds that the Plaintiff's argument

lacks merit.[20]

2.      *SSR 00-4p and DOT listings*

Plaintiff argues that the jobs cited by the VE lack specificity and thus conflict with the DOT

listings in that these jobs require the Plaintiff to demonstrate an ability to interact with the public to

a degree which lacks support in the record.  The Commissioner responds that an ALJ may rely on

a VE's testimony if counsel for the claimant does not challenge that testimony at the hearing.  The

Plaintiff replies citing recent Seventh Circuit case law for the proposition that an ALJ errs by failing

to inquire into inconsistencies between a VE's testimony and the DOT listing.

The Court will first address Plaintiff's argument that the ALJ had a duty to inquire into a

possible conflict between the VE's testimony and the DOT, and then address whether such a conflict

exists here.

a.      *SSR 00-4p*

SSR 00-4p requires an ALJ who takes testimony from a VE about the requirements of a

particular job to determine whether that testimony is consistent with the DOT.  More specifically,

SSR 00-4p provides:

> When a VE or VS provides evidence about the requirements of a job
> or occupation, the adjudicator has an affirmative responsibility to ask
> about any possible conflict between that VE or VS evidence and

---

[20]The Commissioner frames the Plaintiff's incomplete-hypothetical-question argument as "a repetition of Plaintiff's argument with regard to the ALJ's RFC finding, as the ALJ's hypothetical question clearly reflected the limitations the ALJ found credibly supported by the record and incorporated into his RFC finding."  Comm. Mem. at 15.  The Court agrees with the Commissioner–Plaintiff's argument at step five represents a misplaced RFC argument in that Plaintiff asserts that the ALJ failed to consider the limiting effects of certain medical evidence in the record, in particular evidence related to Plaintiff's anxiety and PTSD.  As noted previously, because the Court determined that the ALJ's RFC finding adequately considered all the medical evidence of record, Plaintiff's incomplete-hypothetical-question argument fails for this reason as well.

> information provided in the DOT. In these situations, the adjudicator will:
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4.  Recently in *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006), in which the ALJ heard testimony from a VE as to the plaintiff's limitations but did not ask whether the VE's analysis conflicted with the DOT, the Seventh Circuit concluded that the plaintiff "was not required to raise this issue at the hearing, because [SSR 00-4p] places the burden of making the necessary inquiry on the ALJ."  *Id.* at 735.

However here, unlike *Prochaska*, the ALJ explicitly inquired as to whether the VE's testimony conflicted with the DOT.  *See* R. at 72 ("Q[uestion]: Has your testimony been consistent with the DOT ... ?"  A[nswer]: Yes, it is.").  This single question appears to satisfy the requirement spelled out in SSR 00-4p and clarified in *Prochaska* that an ALJ must ask a VE if the evidence he has provided conflicts with information provided in the DOT.  Accordingly, the Court finds that the ALJ complied with SSR 00-4p and *Prochaska*.

b.    *Potential conflict between VE's testimony and DOT*

In her Reply brief, Plaintiff asserts that, pursuant to SSR 00-4p, the ALJ had a duty to "investigate the inconsistencies between the VE's testimony and the DOT."  Pl.'s Reply Def.'s Mem. Supp. Comm.'s Decision at 12.  In other words, even though the ALJ complied with SSR 00-4p, the Plaintiff appears to argue that reversal or remand is required based on the possibility of a conflict between the VE's testimony and the DOT listings.

The Court disagrees.  SSR 00-4p provides that if the VE's evidence "appears to conflict with the DOT, the [ALJ] will obtain a reasonable explanation for the apparent conflict."  SSR 00-4p, 2000 WL 1898704, at *4.

Here, the ALJ asked the VE if his testimony was consistent with the DOT, to which he responded in the affirmative.  *See* R. at 72.  Thus, from the ALJ's perspective and based on the VE's expert testimony, no conflict existed between the VE's testimony and the ALJ.  Because the ALJ complied with SSR 00-4p, because the Plaintiff declined to cross-examine the VE regarding a potential conflict, and because no potential conflicts were identified, the ALJ was entitled to rely on the VE's testimony in reaching his conclusion at step five.  Accordingly, the Court finds that the ALJ had no duty to inquire further.  *See Lembke v. Barnhart*, No. 06-C-0306-C, 2006 WL 3834104, at *15 (W.D. Wis. Dec, 29, 2006) ("Hearing the VE's affirmative response [that his testimony was consistent with the DOT], the ALJ had no obligation under SSR 00-4p to inquire further").

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Plaintiff's Memorandum In Support of Summary Judgment Or Remand [DE 18] and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

SO ORDERED this 29th day of March, 2007.

s/ Paul R. Cherry
MAGISTRATE JUDGE CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record